Did y'all want a break? I'm sorry I'm not as good, okay? Did you need a break? You may proceed. Is it Mr. Schmutter? Yes, thank you, Chief Judge. Good afternoon and may it please the court. Daniel Schmutter for the plaintiffs. Millions of law-abiding Americans own the switchblade knives that Congress prohibited under the Federal Switchblade Act, the FSA. Knives that are legal to possess under the laws of 45 states. As such, they are typically possessed by law-abiding citizens for lawful purposes. That is, they are in common use. That forecloses the efforts of the United States to defend it broadband on possession, sale, distribution, transportation, and manufacture of these ordinary knives. Knives that differ from other pocket knives only in the single respect that they happen to use a very convenient and useful spring mechanism to open rather than some other means. In fact, many folks could not even tell just by looking at or even holding the knives, whether open or closed, that they are in fact switchblade knives. Notably, the government has wholly abandoned its standing arguments, presumably in recognition of how flawed they are. Well, we've got to talk about it because it's jurisdictional. The district court, reading the district court's opinion, the district court thought there was no standing here at all, but felt that it was bound by our Umphress case, I guess. That was a First Amendment case, and when you're bringing a facial challenge in a First Amendment case, sort of a relaxed injury requirement, a pre-enforcement challenge, does that transfer over to the Second Amendment, and if so, what's your authority for that? Judge, it does transfer over to the Second Amendment, and I don't know that there's specific authority for why Umphress applies to the Second Amendment, but what's important about Umphress No, I'm just saying, why do we relax what is required to show the credible threat of enforcement in a non-First Amendment context? I don't think the court needs to relax the credible threat of enforcement. Well, wait a minute, wait a minute. The Supreme Court's made it clear in lots of precedent that in a facial pre-enforcement challenge, there would be this relaxed requirement. You could basically presume the credible threat of enforcement in the First Amendment context. It doesn't strike me as necessarily given that it transfers over to the Second Amendment or other amendments that may be at issue, and a reason I ask about Umphress is I think if you remove Umphress from the occasion, the district court went the other way, and maybe we should too. Your Honor, we're not asking the court to relax the requirements of standing. We think that the record demonstrates standing without any kind of relaxation of the requirements. We have multiple examples of enforcement in the past. We have the enforcement against Mr. Lumsden. Well, but they're dated. They're very stale. Well, Mr. Lumsden was 2020. So he was, I guess his house or business both were raided, and there were like six statutes at issue. 1242, I think the district court maybe even said it was an outlier. It was in there, to be sure, but that doesn't help you for 1243 at all. Well, for 1243, we have Mr. Shedd. I mean, Mr. Shedd lives on the Muskogee. Well, that sounds like an as-applied challenge. You're making a facial challenge, correct? We are making a facial challenge, but it's not— And nobody's ever enforced 1243. Well, Your Honor, Mr. Shedd lived in Arizona. He owned a switchblade knife. He then moved— I realize he apprehends. He's fearful of possessing one. He wants to possess one in Oklahoma. But, I mean, again, you have to show a credible threat of enforcement, and it's never been done. Well, Your Honor, the one important aspect of this is that the government doesn't disavow enforcement. And under UMFRS—and I know that we're not—the disavow aspect of UMFRS is critically important, because this is not a statute that's never been enforced and has gone into disuse. I mean, they enforce it when they want to. They enforce it from time to time. They enforced it against Spyderco, and I know that Spyderco was a number of years ago. But that was a different statute. That wasn't 1243 or 1242. Well, that wasn't—I understand, Your Honor. But this—it reflects an attitude of the government towards switchblades. They use the statute selectively when they want to go after particular companies or individuals. But you don't substantiate that with regard to these statutes. When—the Spyderco example is actually a very good example. The Spyderco example shows—because what came out of Spyderco is what's called the Spyderco Acknowledgement, the idea that now everybody in the industry has to sign and acknowledge that they're in compliance with the FSA. So it had a sweeping impact that exists to this day. Everybody has to comply with that. But that goes back to my question. How do we quantify or evaluate the threat of enforcement in the Second Amendment context? It is simply the idea that someone is at risk. For example, in addition to Mr. Shedd, we have Mr. Folliter and we have Mr. Arnold. They hold federal firearms licenses. They're FFLs. Now, Mr. Folliter has testified in the record that he goes through the federal possessions and federal territories that under 1243 would be prohibited for possession and sale. And so he can't take the risk— But that's not the threat of enforcement. Well, he can't take the risk that he loses FFL. If he— So the credible threat of enforcement, we're presuming it. The credible threat of enforcement is the government's general approach to this statute over the years, the fact that they use it selectively against targets that they disfavor, and the fact that a person should not be expected to lose their FFL or risk the loss of their FFL when the government won't say, we're not going to enforce this. So it's the disavowal of prosecution. It's the disavowal, it's the risk, and it is the pattern of enforcement over the years. It would be simple enough for the government to say, we don't really think 1243 is a statute we want to enforce anymore. We're all about 1242. So, you know, we're just not going to enforce 1243. They're not going to say that. They'll never say that because they want to use it when they want to use it. The pattern of enforcement that's in the record shows that they use the statute and they want to go after someone— When's the last time they convicted anybody or prosecuted anybody under 1243? I don't have that in front of me, Your Honor. I apologize. I didn't get it from the briefing either. I mean, that's just it. The 1242 convictions or prosecutions are the ones that you all cite, but they're at a minimum 10-plus years old, and you've got three or four or five in the first decade of the century, something like that. Well, Your Honor, it's a simple matter of— But where's the case law that says that's enough for a credible fear of enforcement going forward, pre-enforcement facial challenge? I think under Lujan we'd have standing for sure because we don't have to show that they are enforcing it all the time. Disavowal certainly gets us there, but it's a pattern of enforcement of the statute overall. 1242 and 1243 are part of an overall regulatory scheme. The only difference between 1242 and 1243 is they deal with different aspects of the industry. They go after different aspects of the conduct, the behavior, possession, the sale, the distribution, and so they're split up into two different provisions. It's the same regulatory structure, and so we're not required to show that they specifically have enforced each and every subsection of the regulatory structure to have standing to challenge it. It is their regulatory scheme, and of course the court can ask my friend on the other side why they won't disavow enforcement of 1243 because if they do— Well, we may well ask that, but you're hanging a lot on Mr. Shedd, and the only thing he would be prosecuted for, as I apprehended, is possession. Well, Mr. Shedd would be prosecuted for possession, but— To the extent that the district court found standing based on Mr. Shedd and maybe some of the other members, I guess the fellow whose home was raided in Colorado, I mean, you're looking at possession, and that hasn't been done. Again, I didn't see that under 1243 anywhere. Well, so Mr. Shedd lives in Indian country. Mr. Folliter travels to and sells knives in the various federal areas that are covered. Mr. Arnold travels in those same areas. Mr. Kaufman, Mr. Warden, they all travel in these various areas. They've all testified that they enter these areas and are subject to enforcement in any of these areas as they move about. So all of the plaintiffs have various aspects of standing for the different sections, including 1243 and 1242. Assuming, arguendo, that your clients have standing, could we talk about the facial challenge? Because it's my understanding that you're only bringing facial challenges. Is that correct? Are you bringing as-applied challenges on behalf of any of your clients? So, Chief Judge, that's a very good question, and let me give you an answer. So the challenge to 1243 is strictly a facial challenge. The challenge to 1242 is technically an as-applied challenge because we don't challenge 1242 to the extent it impacts importation into the country from outside the country. On its face, 1242 implicates importation. It prohibits importation. It doesn't talk about importation, but the language of 1242 naturally implicates importation, and the CFR regulation specifically said that 1242 prohibits importation. We don't challenge that. So technically, because it doesn't go to the entire face of 1242, it is technically as-applied, but it behaves analytically like a facial challenge. Probably the best way to describe it is the Eleventh Circuit called it a quasi-facial challenge in the AFSCME case, AFSCME versus Scott. Why is it a quasi? Why isn't it just an as-applied challenge? Because the Supreme Court in Doe versus Reed talked about how as-applied and facial aren't always strict categories. Sometimes claims can share characteristics of each, and the Eleventh Circuit cites Doe versus Reed in sort of coming up with this phrase,  That's very difficult for remedies and things, whether you get to permanently enjoin the whole statute or whether it's just as certain uses that are inappropriate. It's just this quasi thing. Have we adopted that? I haven't seen it in this circuit, Your Honor, but here's why it's not difficult. Wouldn't you just be making a facial challenge to a portion of the statute? Yes, but, Your Honor, normally when you're making a facial challenge to a portion of the statute, you have subsections, right? So if 1242 had A, B, C, D, E, A between states, B between territories, C, right? And D is importation from a foreign country, then we'd say, of course, it's a facial challenge to A, B, and C, but we don't challenge D. It's not written that way, which is where this concept of a quasi-facial challenge comes from, why the Supreme Court described it in Doe versus Reed. It's really based on the relief that you seek. That's what the Supreme Court has said. We're talking about relief. So, Judge Wilson, you're correct that it really behaves like a facial challenge. It's basically we're challenging every aspect of 1242 except the importation ban, and so as to every other aspect of 1242, it is a facial challenge and should be treated as such. But aren't you seeking a permanent injunction against enforcement of sections 1242 and 1243? Except as to importation. Okay. So does that mean you don't think that 1242 and 1243 have constitutional applications ever? 1243 has no constitutional applications. 1242 has no constitutional applications separate and apart from importation. We have no opinion on importation. What about military bases, federal courthouses like this very building and federal prisons? So that's not how to analyze a facial challenge. A facial challenge goes to the language of the statute. So, for example, in Bruin, if it was looked at that way, the case would have come out the other way because New York could have simply said, well, you can't carry in a courthouse in New York. In some places. Right, exactly. But Bruin didn't come out that way because that's not the right way to look at a facial challenge. You have to look at what the statute itself actually prohibits. This statute doesn't have anything to do with courthouses, military bases. I thought that was exactly what they did in Rahimi, a case with which I was more familiar than I ever wanted to be. I mean, they cited Salerno, if I remember, and they said the first thing you're supposed to do is effectively see if there's any application in which it would be valid. And I cannot begin to see how this section 1243 wouldn't be valid as prohibiting switchblades in military bases, courthouse, just like the chief judge just said. So in Rahimi, the way the court applies Salerno is it applies it as to the language and faces, the elements of the offense. There's no element of this regulatory structure that has anything to do with military bases or courthouses. Sure it does. It says federal lands, federal properties, federal facilities, and then it cross-defines them and it breaks it out specifically. Correct. But the reason you can't carry on a military base is because it's a military base, not because it's federal. Well, in Indian country, there's a tribal council hall, government buildings, those kinds of things. You're saying that they can't be prohibited there either? No, we're not saying that. But that's what you are saying in a facial challenge. There's no application that would be upheld. In a facial challenge, we are saying that there is no constitutional application of applying the statute on Indian country because of its Indianness. In other words, the reason the statute bans possession in Indian country is because it's Indian country without regard to the uses on Indian country. Again, go back to Bruin, right? There's no way Bruin could have come out the way it came out if you parse a facial challenge this way, because there are many places within New York where you can't carry a handgun, courthouses, police stations, all sorts of places. And nobody argued that that prevented a facial challenge in Bruin. It's exactly the same here. It's the Indianness that matters as far as the facial challenge. It's the federalness that matters, not militariness, not a courthouseness, if the court understands what I'm saying here. It's critically important because that's what the Ninth Circuit did in knife rights versus Bonta. And it was incorrect. The Ninth Circuit was incorrect. And that would be the incorrect way to look at this. Because if the question the court is asking were correct, it would be impossible to mount any facial challenge under the Second Amendment, because you could always find some corner of a place where possession of an item would be prohibited. It would be impossible to bring any facial challenge to an arms ban, because there's always some place or some circumstance where it would be unlawful to possess that thing. But that doesn't go to the functioning of the challenged law. It's how the challenged law functions that defines whether the facial challenge can be brought or not. Thank you, Mr. Schmider. You've saved time for a rebuttal. Thank you. We'll hear from, is it Janda? Mr. Janda? Yes. How do you say? OK, thank you. Thank you, Your Honor. And may it please the court, Sean Janda for the federal government. The Federal Switchblades Act's restrictions on automatic switchblades lie at the intersection of three distinct principles, each of which independently confirms the restriction's validities. I'm happy to walk through each of those three historical principles. But just to get them on the table, first, we have the very well-grounded historical principle that states that the state or the federal government now may regulate concealed and therefore inherently concealable weapons like the automatic switchblades at issue in this case. Second is the similarly well-grounded principle that the Second Amendment does not extend to weapons that are adapted for criminal misuse. And then third is the principle that modest restrictions, such as those on the manner and mode of operation of weapons, do not reflect an infringement of the Second Amendment right. I think taking the confluence of those three principles together in this case provides more than ample support on the merits for both Section 1242 and Section 1243. Does the government consider 1242 to be a moribund law, given that it has not been charged in 15 years? I'm not sure that the category moribund has any particular historical or legal significance. What I can tell you is that, obviously, it is not charged often. Does the government disclaim that it can charge 1242 today, tomorrow, the next day? No, we think 1242 and 1243 are constitutional. We think we could charge them. And you're prepared to charge them tomorrow? Any violations? We have certainly not disavowed charging them. We think we could charge them. I'm not saying there's some investigation where charges are about to be made. And what is the date 1243 was done? 1242 is 15 years, right? Correct. What's 1243? So 1243, the record, if you look at ROA 1265, it cites a declaration from the Executive Office of the United States Attorneys, which says that as far back as the data goes, which is 2004, we have no reported prosecutions of 1243. And so at some point before 2004, there may well have been them. But the EOUSA data just doesn't. If this was a First Amendment challenge, would that be good enough for standing, if this was a First Amendment challenging? Yeah, I mean, so we think that in the particular circumstances of this case, the plaintiffs have standing. I think they would have standing probably even more clearly in a First Amendment. In a First Amendment, they would definitely have standing. And you think they have standing here? We do. And I will caution the Court. I don't think you need to relax the usual test in the way that it sometimes is relaxed in the First Amendment context. Why wouldn't we have the same sort of concern for chilling in the Second Amendment that we have in the First Amendment? I mean, I think that's a doctrine that is developed in the particular context of the First Amendment. I mean, there are a number of doctrines around. Right, it has. But we've had a great emphasis on the Second Amendment in the past decade. Why wouldn't we have the same sorts of concerns for chilling of Second Amendment rights that we have for First Amendment rights? I mean, I think chilling is sort of intimately connected to expression. And there's a whole set of doctrines. There's over-breath doctrines. There are sort of vague doctrines in the First Amendment. You could have over-breath doctrines and things, even in the context of different places and applications of how you know where you can and different types of knives. There could be confusion and vagueness. You could have all kinds of those theories. Just as a conceptual matter, why couldn't you have a chilling doctrine for Second Amendment? Yeah, I mean, let me say, I think in this case, the simplest answer is that because it's not necessary and plaintiffs haven't asked you for it. Because you believe they have standing. You believe they have standing because why? I mean, I think I would point the court to maybe the sort of combination of four things in this case. I mean, number one, I think it's very clear that they wish to engage in conduct that is absolutely prescribed by the statute. And they've made that clear. They've not been wishy-washy about it. They're very intent. Yes, and they have, I think, very clear declarations with very specific examples. Then why in the world did we litigate this to the hilt in the district court, not once but twice? I think the first case in the district court, the one that Judge O'Connor dismissed, the declarations were much more challenging to get them to standing. I think they came back with new and better declarations. And then we made the arguments in district court. I mean, I think as Your Honor recognizes. But you partially won the argument in district court. Correct. And I'm not saying they're unreasonable arguments. I think they're quite reasonable given the lack of. But the government changed its position. Correct. We took another look at this. I think we. So this is what's caused us a lot of time and attention on this. Is that right? On the standing question, yes, Your Honor. And then can I just go back? I think the other three things I'll point to. I mean, number one, this is a criminal statute with criminal penalties. So you shouldn't have to go to jail to prove you're right? Is that? I think it certainly points in that direction. Again, I'm saying that. This is an interesting argument where you're both arguing that they're standing. And you're making the pro arguments against the argument. But keep going. This is helpful. Well, do you agree that we should just remand this to the district court then in light of your concession? I don't think you need to do that. Well, let me say two things. I mean, number one, the district court did find standing as to 1242. And so I think the merits holding on 1242 is up in front of this court squarely. But as to 1243? As to 1243, I think if this court agrees with us about the defense of 1242, it applies, I think, sort of exactly the same way to 1243 because it's about the knives themselves and not about the particular regulations. Can you go really quickly through your four factors, though? You were doing such a good job. Oh, yeah. So I think the four things I would say. I mean, number one, they very clearly have established an intent to engage in conduct that we all agree is prescribed by statute. Criminal conduct. OK, go ahead. Number two, it's a criminal statute with criminal penalties. OK. Number three, we are not in a position to disavow enforcement. I am, like, affirmatively telling you we will not, have not, are not disavowing enforcement. And then number four, I think one particularly special thing about this case is that at least 1242 operates on manufacturers and distributors. And so I think what the plaintiffs would say is like, look, even if they were willing to sort of take the plunge and buy the knives interstate, they may well not be able to get them because. The whole commerce will be chilled. Well, because, right. So other, the people who they want to buy them from, I think is what they're getting at. Yeah, they won't have making, they will stop making them because it's not. Yeah, or they won't sell them interstate because they want to comply with the federal law. And so I think if the court feels compelled to say much about the standing issue, I might point to those four things kind of all coming together in this case as sufficient to give the plaintiff standing. Anybody else have any more on standing or you want him to go to merits on 1242? Merits on 1242. Yeah, so then on 1242, I'm happy to talk about the facial challenge aspect as 1243 as well. But on 1242, as I think we really have these three quite well-grounded historical principles. I mean, the first one is there is this extremely well-developed history of regulating sort of first the concealed carry of weapons like dirks and daggers. And then that develops into regulation of the carry at all of concealable weapons. But the government didn't talk about this in the district court, did it? I mean, I think we did have a merits defense along these lines. But did you talk in detail about the well-developed history? Did you? I think we probably developed it more in our briefs on appeal than we did in district court. I think in district court, we made a number of other arguments. Does it matter whether you actually developed it or not? I don't think. I mean, plaintiffs certainly haven't made an argument that we forfeited these arguments. My memory is that we certainly did make the historical arguments. I think Amaki mentioned something about that. Yeah, I think we've maybe rejiggered how we've sort of categorized the historical traditions. Well, am I reading the district court's order and opinion incorrectly? The district court sort of stopped before Bruin Step 2 and said, well, this really isn't a ban or prohibition. It's sort of a regulation. It's not like Reese. It's like our other recent case, which is escaping me at this point. McCrory. McCrory. And so there really wasn't a Bruin analysis, a historical analysis of these provisions, correct? Correct. Should we just remand this for a Bruin analysis if we think Bruin applies? And also for whatever, the 1243 with the standing concession? Yes. I mean, I don't want to say yes, you should. I think the arguments are briefed in front of you. And if the court sort of wants to decide what I think really are purely legal arguments, the court is certainly in a position to do so. But the district court, I mean, just didn't do the historical analysis that we think this court ought to do. And it didn't engage with the merits of the 1243 challenge given its holding on standing. And so I don't think there would be anything inappropriate about the court. Do you think McCrory is not the right standard? I mean, just again, I think in taking another look at this, with McCrory and Reese as kind of the two poles that we're trying to navigate between, our view is that this restriction operates more like the restriction in Reese, particularly given plaintiff's evidence, or at least their assertions, that some of the plaintiffs are simply unable to acquire. I mean, Reese was the 18 to 20-year-old ban, right? And McCrory was the 10-day waiting period, or am I confused? Yeah, 10 business day waiting period for, I think, also for 18 to 20-year-olds. I mean, this statute, sir, sounds like a lot closer to a ban. Right. I think that's our view. And at least. And you're saying you can, government can do that, ban's OK. Correct. Given the particular historical provenance that we have with respect to concealed knives, concealable knives. The ban isn't OK because these weapons are outside this protection of the Second Amendment, short-barreled shotguns. The ban's OK because it comports with historical analogs, relevantly similar from back in the day. I mean, to the extent the question's getting at whether this is kind of a Bruin step one or step two argument. Yes. I'm not sure that the court needs to figure that out. I think this is a place where step one and step two merge, whether it's sort of a gloss on the text as informed by history, or whether it's sort of manners of historical regulation. Our point is just that these sorts of weapons, dirks, daggers, Bowie knives, I mean, there's a whole real historical purpose here of state regulations of those weapons. Well, but I guess the reason I'm asking that is I'm not sure that step one and two converge necessarily. I do think there's a distinction, whether this particular switchblade knife is even within the kind of weapon protected by the Second Amendment, but it could be regulated, access to it, et cetera. Or it falls outside the Second Amendment altogether. A short-barreled shotgun is how I read Hiller and how I read McDonald. So therefore, we don't even get to Bruin. A ban's OK. You can just flat out say you can't have them. I mean, I think we think this operates sort of on similar historical principles to the short-barreled shotgun regulations, the NFA's regulations. So where you would put that bucket, I think, is probably where you would put these arguments. Can the government ban all knives? I think it may well not be a Second Amendment problem to ban knives. It may well be sort of a silly law for a lot of other reasons. Why would it not be a Second Amendment problem to ban all knives? I think we have this very clear historical tradition concluding that all sorts of knives, small sort of not swords, which I think are protected, but sort of dirks, daggers, bowie knives. But if you don't want to go that far, if you think that that's... Of outright bans. I mean, I guess what I'm getting at, you sort of argued this concealed, if it can be concealed, rule. I mean, most knives, pocket knives, they fit in your pocket, by definition, can be concealed. So the government could ban all of them altogether. I wouldn't say if it can be concealed. I think the way I would put it is if it's sort of, in the words of the Andrews case that we cite, sort of adapted to concealability. Then it falls outside the protection of the Second Amendment's right. But if you don't sort of want to go that far, as I said, we have three traditions here. The concealability tradition is the first one, which I think provides a lot of support here. But then you also have the sort of adaptive or criminal misuse tradition, which I think applies quite neatly to the automatic switchblades, which have that combination of sort of concealability, but also ability to unleash damage at a moment's notice that you might see with a short-barreled shotgun or a short-barreled rifle, as compared to a rifle or a shotgun or a pocketknife. So I think that comes in as well. And then the third principle, which maybe is the narrowest one in this particular case, is that these sorts of regulations on the manner and mode of operation were not historically thought to constitute an infringement of the right. Yeah, but this is a ban on possession. That's not a mode of operation. You can't have it. So I wouldn't think of it that way, Your Honor. I would think of it as a... That's what 1343 says. So I think of it as saying you can't have, at least on federal and tribal land, a switchblade where the blade folds into the handle and is released by the operation of a button. And so the regulation really operates on the press of the button rather than... and the folding in, rather than on banning all pocketknives, banning knives altogether. So it's kind of like a machine gun. I think quite similar to a machine gun, I mean, quite similar... Just another example, there's a federal statute that requires that all handguns have a particular amount of metal in them so that they can be captured by metal detectors, which, you know, you could stand up here and say that operates as a complete ban on all polymer handguns. But I think what we would say is, no, no, it's sort of regulation of the manner and mode of operation requiring a small amount of metal in the gun. And so I think the same thing here is if you want to get outside the restrictions of the Federal Switchblade Act, you need a knife that operates in a slightly different way that you have to pull out or that's fixed-bladed. But these arguments were not made to the district court. They certainly weren't ruled on by the district court. Yes, and the district court went in a completely different direction under the guidance of the government. And so should we be dealing with all of these moving parts as a court of appeals? You know, look, I think this court could say, you know, the district court was wrong or the government's not defending the holding, that the 1242 holding on the merits, the 1243 holding on standing, we vacate and remand. That that would dispose of the appeal and the district court could consider these questions in the first instance. You know, I think if the court wants to consider the questions, certainly we've tried to give the court the briefing and the argument to allow it to do so. Do we have the briefing and argument now to do that? I think you do at this point. But again, I think if the court still has questions or the court thinks it would benefit, these issues would benefit from erring in the district court in the first instance. There's certainly no impediment to remanding and allowing the district court to consider. The one thing I might say is that when it comes to the facial challenge issue, I think that's really a purely legal question about whether or how to think about facial challenges and it may be helpful to provide the parties guidance. You know, if the court were to say, for example, that plaintiffs might be well-advised to amend their complaint to bring an as-applied challenge if that's sort of really what they want to do, that, again, may be helpful. Should we have a quasi-facial challenge doctrine in this circuit? I mean, I would think of it the way that... Like the 11th? Do you believe? I would think of it the way that Judge Wilson thought of it, which is just it's a facial challenge to part of the statute and you don't need to have the statute broken out into subsections to be able to facially challenge. You can just say this sentence and that sentence and that paragraph between these two commas is facially challenged. Right. And, again, I think that would be perfectly fine. I think when it comes to their 1242 challenge, that's what's happening. You know, we don't take our pencil out and line edit these statutes, though. I mean, I think the way it would work in this case is if the plaintiffs, maybe just focusing on their 1242 challenge, if they won on the 1242 challenge at the end of the day, they would probably get an injunction that says we can't enforce 1242 as applied to the distributing, manufacturing, but not as applied to the importation, which I think would just sort of match up with the parts of the statute that they are challenging. So you just think it works its way out in the remedy? I mean, I think there's a lot of focus in plaintiff's briefing and in the way they frame their complaint about the sort of facial as applied distinction. I think the real question, I mean, at the end of the day, is just, like, what do they want to do? And do they have a constitutional right to do that thing? And if they're right that they have a constitutional right to do the thing and the statute prohibits it, then they get an injunction saying that we can't enforce the statute as to that thing. What is the lay of the land of the states vis-a-vis these switchblades? Yeah, so there are, I think, five states in the District of Columbia that sort of flatly prohibit their possession. There are, let's see, I have a list somewhere. There are, I think, three more states that ban switchblades above a certain length, which may vary. Three more sort of generally ban them, but have some exceptions. So are we up to 11? I think that is, yes, 11 plus DC. So the vast majority do not ban these? The vast majority of states do not ban them. Yes, that's the vast majority of states do not ban these and allow these weapons. Correct, although with one... What about the three states in this circuit? Texas, Mississippi, and Louisiana. So I'm not sure what those three states do. I don't remember seeing them in the list of states that ban. I will say that a number of major local jurisdictions also have bans, because I think there are particular circumstances. Well, one of the oldest cases I think you cite, actually, was Louisiana case that 1813, there was a law that basically said you couldn't possess concealed... Possess them concealed, correct. You possess, I mean, darts, daggers, all sorts of small blades. Right, but I mean, that would suggest that that's been Louisiana law since statehood. Or no. Well, I think that if that law is still in effect, it would mean that you can't possess them concealed, which may well mean you can't possess them. I mean, I don't think the plaintiffs say they want to walk around with the knife out the whole time that they have it. I would think they want to fold it up and put it in their pocket. You can have open carry of switchblades? I think as a theoretical matter... I'm not being facetious. No, no. I'm just, you know, that's the question. It's got to be concealed or not. Right, I mean, I think that goes to sort of the first historical tradition we've identified, which is that, you know, although a lot of the laws, the earliest laws that we identify talk about concealed carry, it's, like, really hard to imagine someone... If we were to dive into the merits of all this, what is the government's position? What's the position of the United States on what the proper reference date would be? Is it 1791? Is it 1868? So we haven't taken a position on that question. I wouldn't want to get ahead of my skis on that. What I would say in this case is that, you know, we have a lot of state Supreme Court cases and other sort of commentary, and the commentary and cases themselves post-date the immediate founding, but I think they are thinking about how the laws that they're identifying fit within this much broader historical tradition. But Bruin looked back to 1791, did it not? It was a federal act, so therefore... No, Bruin was a state act, so it sort of grappled with the question Judge Willard asked. 1791, 1868, sometime in between or after. But Brahimi was a federal law, and if I remember correctly, they went back to 1791. I mean, I think it is true that probably 1791 is sort of more helpful than later enactments. Well, in 1791, there was no dispute that the Second Amendment applied as against the federal government. Correct. There was some, I guess, question, maybe until late into the 20th century, whether it applied at all to the state governments. Correct. One more question?  So, assuming 1791 is the magical date, can you identify, is there any kind of founding era, not Reconstruction era, any founding era regulation that restricted the acquisition or possession or distribution of a class of arms? Not how those arms are carried, not how they're used, but acquisition, possession, distribution. So we don't cite any of those in our brief. To be candid, I'm not aware of any. I think the earliest law that we cite in our brief is the 1813 Louisiana law. The Ninth Circuit opinion that we filed the 20HA about goes back to a 1686 New Jersey law. That's the earliest one that they found. But again, I think the earliest laws that we have found operate on the concealed carrying. But then, in the historical tradition, I think it grows organically, and you have the later, the Reconstruction era laws that apply that tradition to the inherently concealed weapons themselves. And the authorities just don't seem to draw a distinction there, which, again, I think goes back to the point that it's really weird to think of someone who wants to open carry an automatic switchblade. You can ask the plaintiffs. I suspect their clients don't want to walk around every time they're in public and have the blade out and open. I think the whole point is that you can conceal it. And so I think those traditions really do merge in this context. Well, you could have it closed, but people could know what it was. I'm not sure that that's right, Your Honor. I bet you wouldn't want to put it to the test, because I bet you there'd be plenty of people who would be willing to open carry. If that was the distinction between concealed and open. Maybe, but I think the point, again, is just that in the history itself, the very small move from no concealed carry to no protection of inherently concealed or adapted to be concealed weapons, the pocket pistols, the sword canes, the dirks, the daggers, is a move that happens in the history and is well-grounded and situated in the historical tradition. And that's, I think, all the court would need to say if it were to reach the merits. Even if we were assuming arguendo to come out differently than the Ninth Circuit, there would not be a circuit split on this, would there? Because that was dealing with the California statute specifically and not the federal statute. I mean, there would not be a... There would not be a circuit split as understood by the concept of circuit splits and requirements to precirculate opinions and all kinds of things that happen when you have a circuit split. Because it wouldn't be the Federal Firearms Act. I mean, the Federal Switchblade Act. We're not dealing with the state law. Right, so the Ninth Circuit opinion is about state law. Yeah, it's the state law. California Switchblade Statute, yeah, or whatever it's called. Correct. So I don't want to speak to the court's internal practices about circulating opinions. No, I'm not asking you to evaluate this. But there would not be an actual circuit split on this statute? It would not be on this statute. It may well be, depending on what you say. It might be some kind of reasoning or tension or whatever, but that's not... It's a different statute. They applied... They were inquiring into the California law. Correct. Okay. If there are no further questions, we would ask the court to affirm. Thank you. Or to remand. Or to remand. Whatever the court wants to do. It's very important that the court not lose sight of what rule governs this case, which is the common use rule. There is no adapted to criminal use rule. That's just interest balancing. We don't compare what criminals can do with arms versus what law-abiding individuals can do with arms. If the arm is typically possessed by law-abiding citizens for lawful purposes, that's the end of the inquiry, which is why the court need not remand to the district court, because there is no further Bruin analysis to do. The Supreme Court did the entire historical analysis for arms bans in Heller and announced the common use test. If switchblades are typically possessed by law-abiding citizens for lawful uses, they are protected. That's the end. The government does not get to do more historical analysis. That said, the historical analogs that they've tried to provide don't help at all. None of them, with the exception of maybe West Virginia, which is an outlier, is an outright arms ban. We know from Bruin that three analogs aren't enough. Certainly one analog isn't enough. Almost all of the cases and statutes that deal with this kind of stuff are conduct-based. They're either a fray or going armed type laws, or occasionally there's a ban on concealed carry, but not bans on total carry. As we know from cases like Nunn or Chandler, you have to have some basis for carry, and of course we know from Bruin you can't ban all forms of carry. So even if the government does get to do additional historical analysis, which they don't, none of that helps them in this case. I want to address standing briefly, because I'd like to just sort of point out, with Mr. Lumsden, his issues are still going on. They seized his hard drives and his computers, and they still haven't given them back. They're enforcing the statute today. So enforcement continues in Mr. Lumsden's case. I heard my friend on the other side adamantly refuse to disavow enforcement of 1242 and 1243. It's a criminal statute. The purpose of a statute like that is deterrence. The whole idea that my friend on the other side got up here and said that should scare anyone who lives in any circumstance or operates in any circumstance where they would run afoul of 1243. In addition to prosecution, losing their FFLs, any number of those circumstances. That alone should support standing in a case like this. I will briefly, if the court wants, I can address 1791 versus 1868. This is a federal statute, so none of the 14th Amendment arguments as to why it's not 1791 would apply in any of them. So this court doesn't even have to resolve that question. But if the court decides to resolve that question, the Supreme Court was actually pretty clear in Bruin. Even though they said nominally, we don't have to decide this today, they basically made it clear that how the Second Amendment works under federal law and state law is supposed to be the same. And so the idea that there's some different Second Amendment for state law that would deal with 1868 doesn't make any sense, even though they sort of Well, they've sort of alighted the issue. I mean, the reality is that analogs might be a lot more salient for state laws if they dated from the 1870s, 1880s, 1890s, less so if we're talking back to the founding era and it's a federal restriction. Correct. And since this is a federal law. But I also think that you sort of brush aside the state analogs that the government offers as well. They're just state laws. But most of the Bruin or Rahimi cases that we've handled or that I'm familiar with have gone and looked at colonial laws and state laws and other instances, even back to the laws of England, the statute of Westminster, Northminster, I can't remember which Minster. But we're looking for any sort of restrictions that would have been salient at the time the amendment was adopted, whether they're state or federal. There were no federal laws at that point, and there were very few in the first couple decades. I'm sorry, Your Honor. I didn't mean to imply that state law analogs don't inform the historical tradition. I didn't mean to say that, if that's what Your Honor understood. What I was saying is that the government's analogs don't work. They're not proper analogs. They're not relevantly similar. This is a ban. None of those are bans with the exception of one outlier. Those are conduct-based prohibitions. In a couple of instances, they are simply prohibitions on concealment. Okay, I appreciate the clarification because I had read the briefing to sort of minimize the states because it was a federal law. But how does this feed into the issue of facial challenge? In other words, if there's a whole category of manner of usage, you can't conceal these things. Then does that defeat a facial challenge because there are applications that would be within the historical tradition? It does not, Your Honor, and for the same reason as I explained before. The Salerno test goes to what the elements of the offense are. This statute has nothing to do with concealment versus non-concealment. It has to do with manufacture, distribution, possession. In fact, that's exactly what the Ninth Circuit did. The Ninth Circuit took a very broad statute and said, well, if possession is banned, carry is banned. If carry is banned, that means at least conceal carry is banned. So now we're going to find a historical tradition, and by the way, they were wrong about that anyway on the merits, but we're going to find a historical tradition that says you can ban, conceal, carry, right? And so now we're going to find the facial challenge fails. That's exactly the same thing as suggesting that Bruin fails because courthouses in New York, it would be constitutional to prevent carry of a handgun. So for the exact same reason, that's not the correct analytical way to understand how Salerno applies to facial challenges. Thank you. We appreciate your argument, and we appreciate the argument of the other side, and this case is submitted. The court will stand in recess until 9 a.m.